**BEALL & BURKHARDT**
WILLIAM C. BEALL, STATE BAR NO. 97100
ERIC W. BURKHARDT, STATE BAR NO. 132812
1114 STATE STREET
LA ARCADA BUILDING, SUITE 200
SANTA BARBARA, CALIFORNIA, 93101
(805) 966-6774, FAX (805) 963-5988

Proposed Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re A.<br>B and H Flowers, Inc., A<br>California Corporation,<br>Debtor. | Bk. No. 9:11-bk-12650-RR<br>Chapter 11<br><br>MOTION FOR ORDER AUTHORIZING<br>USE OF CASH COLLATERAL;<br>DECLARATION OF PAUL DANIEL IN<br>SUPPORT THEREOF |

Hearing to Be Set

Place: 1415 State Street
Courtroom 201
Santa Barbara, CA 93101

Debtor, B and H Flowers, Inc., a California corporation ("B and H"), makes its motion for an Order Authorizing Use of Cash Collateral as follows:

## I

## FACTS

Debtor B and H is one of the leading flower growers in North America and its primary place of business is in Carpinteria, California. It is part of a proud family tradition that has been raising and selling flowers in the United States and Europe for six generations. B and H purchases bulbs from all over the world and

1  sells to both large and small customers throughout the United
2  States. Based on sales to date, B and H generated over $16,000,000
3  in sales revenues in fiscal year 2011, which ended April 30, 2011.

4      The debtor owes pre-petition obligations to Rabobank.   On
5  November 10, 2003, Rabobank (as its predecessor, Mid-State Bank)
6  filed a UCC-1 financing statement and a amendments thereto with
7  the California Secretary of State with filing number 0331860374
8  perfecting its interest in the debtor's accounts, inventory and
9  accounts receivable.

10      In order for the debtor to continue in operation, the debtor
11  will need to pay ongoing expenses, including wages, purchase of
12  inventory and payment of utilities, among other things.   The only
13  realistic source of funds for the payment of the ordinary and
14  necessary costs of operation of the debtor's business is through
15  use of its prepetition accounts, the sale of the debtor's inventory
16  and the collection of the debtor's pre- and post-petition accounts
17  receivable.

18      Rabobank has liens on virtually all the assets of B and H
19  including the accounts, accounts receivables, inventory, equipment
20  and general intangibles of the debtor. Thus, the income stream from
21  the business is cash collateral of Rabobank as that phrase is used
22  in 11 U.S.C. §363(a). Rabobank has five separate loans, each with a
23  separate Agricultural Security Agreement, and all part of one UCC
24  filing. True and correct copies of the Rabobank Agricultural
25  Security Agreements (and the respective most recent change in terms
26  agreements), along with the UCC filing and Amendments, are attached
27  as Exhibit "A" and incorporated herein by this reference.

28

**1**

**2**                                                    II

**3**                    PROPOSED USE OF CASH COLLATERAL

**4**        In order to operate its business post-filing, the debtor

**5**   must be able to use cash collateral.  The cash collateral which

**6**   the debtor wishes to use is all items of the income stream

**7**   derived from the business. The debtor wishes to use the cash

**8**   collateral to pay its ordinary, necessary business expenses.  A

**9**   copy of its proposed budget for the next 60 days is attached

**10**  hereto as Exhibit "B". At month end, the debtor proposes to pay

**11**  the monthly interest amount (without prejudice as to the

**12**  characterization of such payments as principal or interest) on

**13**  its five loans to Rabobank. B and H has four other comparatively

**14**  small secured creditors for vehicle and equipment loans (with

**15**  debts ranging from $2,700 to $16,000). B and H also proposes to

**16**  have the Order authorizing the use of cash collateral provide for

**17**  a continuing lien in favor of Rabobank.

**18**                                                   III

**19**                                                ARGUMENT

**20**       The use of cash collateral is described by 11 U.S.C.

**21**  §363(c). §363(c)(2) provides that the trustee may use, sell or

**22**  lease cash collateral if:

**23**           (b)  the court, after notice and a hearing, authorizes
            such use, sale or lease in accordance with the
**24**         provisions of this section.

**25**
        This is a right given to the debtor-in-possession as well as the
**26**
        trustee pursuant to 11 U.S.C. §1107(a).  Thus, the court is
**27**

**28**

                                                  3

**1** empowered to authorize the use of cash collateral upon a proper
**2** motion.

**3**    Generally, the court should approve the use of cash
**4** collateral when the creditor is adequately protected. See, e.g.,
**5** In re Markim, 15 B.R. 56 (E. D. Pa. 1981).

**6**    Here, Rabobank is adequately protected in at least two
**7** fashions.  The first form of adequate protection held by the
**8** Rabobank is the interest payments being offered which should keep
**9** Rabobank's debt from increasing. Second, B and H is nearing the
**10** completion of a substantial restructuring of its business which
**11** includes shutting down additional operations which are in
**12** Watsonville, California and focusing its business on the most
**13** profitable flower types. The Watsonville shut down will allow B
**14** and H to cut its workforce almost in half, stop a significant
**15** monthly lease payment (approximately $40,000 per month) and
**16** significantly reduce its transportation costs. Even while these
**17** changes are being made, B and H projects that it will be
**18** profitable over the next two months. After these changes are
**19** completed, B and H expects that it will actually be more
**20** profitable even with lower projected revenues of approximately
**21** $11,000,000 - $12,000,000 in fiscal year 2012. The debtor through
**22** its declaration establishes that the business can be run at a
**23** positive cash flow and that there will be significant ongoing
**24** accounts receivables and inventory upon which Rabobank can obtain
**25** a continuing lien.  Thus, use of the cash collateral will
**26** generate greater net revenues, which will at least maintain if
**27** not enhance the position of Rabobank.

**28**

1    For the foregoing reasons, debtor B and H requests that this

2    court enter its Order Authorizing the Use of Cash Collateral and

3    setting a final hearing with regard to a more permanent Order

4    regarding the use of cash collateral.

Respectfully Submitted,

5

6    Dated:    6/3/2011                    BEALL & BURKHARDT

7

8                                    By: _____

9                                        Eric W. Burkhardt,
                                         Proposed   Attorneys   for
10                                       Debtor, B  and  H  Flowers,
                                         Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF PAUL DANIEL

2      I, Paul Daniel, declare and state as follows:

3      1.   I am the CFO for the debtor and debtor-in-possession in

4  Bk. No. 9:11-bk-12650-RR, filed June 3, 2011.  Each of the

5  matters set forth below is stated of my personal knowledge and if

6  called as a witness, I could competently testify to each of them.

7      2.   Debtor B and H is one of the leading flower growers in

8  North America and its primary place of business is in

9  Carpinteria, California. It is part of a proud family tradition

10  that has been raising and selling flowers in the United States

11  and Europe for six generations. B and H purchases bulbs from all

12  over the world and sells to both large and small customers

13  throughout the United States.

14      3.   Based on sales to date, B and H generated over

15  $16,000,000 in sales revenues this fiscal year. Rabobank has

16  liens on virtually all the assets of B and H including its

17  accounts, the accounts receivables, inventory, equipment and

18  general intangibles of the debtor. Thus, the income stream from

19  the business is cash collateral of Rabobank as that phrase is

20  used in 11 U.S.C. §363(a). Rabobank has five separate loans, each

21  with a separate Agricultural Security Agreement, and all part of

22  one UCC filing. True and correct copies of the Rabobank

23  Agricultural Security Agreements (and the respective most recent

24  change in terms agreements), along with the UCC filing and

25  Amendments, are attached as Exhibit "A" and incorporated herein

26  by this reference.

27      4.   B and H is nearing the completion of a substantial

28  restructuring of its business which includes shutting down

1   additional operations which are in Watsonville, California and

2   focusing its business on the most profitable flower types. The

3   Watsonville shut down will allow B and H to cut its workforce

4   almost in half, stop a significant monthly lease payment

5   (approximately $40,000 per month) and significantly reduce its

6   transportation costs. Even while these changes are being made, B

7   and H projects that it will be profitable over the next two

8   months. After these changes are completed, B and H expects that it

9   will actually be more profitable even with lower projected

10  revenues of approximately $11,000,000 - $12,000,000 in fiscal year

11  2012. Such sales revenues should generate significant ongoing

12  accounts receivables and inventory upon which Rabobank can obtain

13  a continuing lien. Thus, use of the cash collateral will generate

14  greater net revenues, which will at least maintain if not enhance

15  the position of Rabobank.

16      5.   Attached hereto as Exhibit B and incorporated herein by

17  this reference is a projected budget for B and H's operations for

18  the first 60 days of the case. I believe that the business can

19  continue to operate on at least this level.

20      I declare the foregoing is true under penalty of perjury.

21      Dated:     June 3, 2011

22                                         Paul Daniel, CFO B and H
                                           Flowers, Inc.

23

24

25

26

27

28

7

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,100,000.00 | 06-07-2007 | 10-21-2007 | 9416769801 | | | | CV |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  B & H FLOWERS, INC.
3615 Foothill Road
Carpinteria, CA 93013

**Lender:**  Mid-State Bank & Trust, a Division of Rabobank, NA.
Special Assets Department
536 Camino Mercado
Arroyo Grande, CA 93420
(805) 473-6400

---

**Principal Amount:  $4,100,000.00**        **Initial Rate:  9.750%**        **Date of Agreement:  June 7, 2007**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** A loan evidenced by a promissory note dated October 21, 2003, in the original principal amount of $1,500,000.00 and referencing Loan No. 9416769801, together with all modifications thereof ("Note"). The outstanding principal balance due under the Note, as of the date of this Agreement, is $2,550,370.63.

**DESCRIPTION OF COLLATERAL.** All Inventory, Accounts, Equipment, General Intangibles, Farm Products and Crops as described in that certain Agricultural Security Agreement dated October 21, 2003, referencing Loan Number 9416769801 ("Security Agreement") and further detailed in that certain UCC Financing Statement filed with the Secretary of State November 10, 2003 and numbered 0331860374 evidencing the perfection of Lender's secured interest in the Collateral.

**DESCRIPTION OF CHANGE IN TERMS.** The Note is hereby modified as follows:  The amount of the line of credit evidenced by the Note is hereby increased from $3,100,000.00 to $4,100,000.00.

Business Loan Agreement (Asset Based) Replacement

All terms and provisions of the Business Loan Agreement (Asset Based) dated June 7, 2007 shall take precedence over the Business Loan Agreement (Asset Based) dated November 16, 2006 and shall be added as terms of this Loan.

Agricultural Security Agreement Replacement

All terms and provisions of the Agricultural Security Agreement dated June 7, 2007 shall take precedence over the Agricultural Security Agreement dated October 21, 2003 and shall be added as terms of this Loan.

The Note is hereby amended to add the following under the heading "DEFAULT":

**CROSS-DEFAULT.**  HANS BRAND OR ESTHER BRAND ("GUARANTOR") FAIL TO COMPLY WITH OR TO PERFORM ANY OTHER TERM, OBLIGATION, COVENANT OR CONDITION CONTAINED IN ANY NOTE PAYABLE TO LENDER OR IN ANY RELATED DOCUMENTS OR TO COMPLY WITH OR TO PERFORM ANY TERM, OBLIGATION, COVENANT OR CONDITION CONTAINED IN ANY OTHER AGREEMENT BETWEEN LENDER AND GUARANTOR, INCLUDING WITHOUT LIMITATION, THAT CERTAIN PROMISSORY NOTE DATED JUNE 7, 2007 EXECUTED BY GUARANTOR IN FAVOR OF LENDER IN CONNECTION WITH LOAN NUMBER 9420465888.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 21, 2007.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning June 21, 2007, with all subsequent interest payments to be due on the same day of each month after that.

**VARIABLE INTEREST RATE.**  The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each Day.  Borrower understands that Lender may make loans based on other rates as well.  The Index currently is 8.250% per annum.  The interest rate to be applied to the unpaid principal balance during this loan will be at a rate of 1.500 percentage points over the Index, resulting in an initial rate of 9.750% per annum.  NOTICE:  Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**CROSS-DEFAULT/CROSS-COLLATERALIZATION .**  BORROWER HEREBY AGREES THAT ANY DEFAULT BY IT UNDER ANY AGREEMENT WITH LENDER AND ANY DEFAULT BY HANS BRAND OR ESTHER BRAND (COLLECTIVELY, "GUARANTORS") UNDER ANY AGREEMENT WITH LENDER, INCLUDING WITHOUT LIMITATION, THE PROMISSORY NOTE DATED JUNE 7, 2007 (THE "GUARANTOR NOTE"), SHALL CAUSE EACH AND EVERY OF BORROWER'S AGREEMENTS WITH LENDER TO BE IN DEFAULT WHEREUPON LENDER MAY DECLARE ALL INDEBTEDNESS AND OBLIGATIONS OF BORROWER TO LENDER IMMEDIATELY DUE AND PAYABLE.  IN SUCH CASE, LENDER MAY PURSUE ALL COLLATERAL WHICH SECURES ANY AND ALL INDEBTEDNESS AND OBLIGATIONS BETWEEN BORROWER AND LENDER AND ALL COLLATERAL WHICH SECURES ANY AND ALL INDEBTEDNESS AND OBLIGATIONS BETWEEN GUARANTOR AND LENDER.  THIS PROVISION IS APPLICABLE BUT NOT LIMITED TO ALL AGREEMENTS GUARANTOR HAS WITH LENDER PURSUANT TO LOAN NUMBER 9420465888, AND IS APPLICABLE BUT NOT LIMITED TO ALL AGREEMENTS BORROWER AS WITH LENDER PURSUANT TO LOAN NUMBERS: 9418397901, 9416770101, 9418396001, and 9419933601.

# AGRICULTURAL SECURITY AGREEMENT

**Grantor:**   B & H FLOWERS, INC.
3615 Foothill Road
Carpinteria, CA  93013

**Lender:**   Mid-State Bank & Trust, a Division of Rabobank, NA.
Special Assets Department
536 Camino Mercado
Arroyo Grande, CA  93420
(805) 473-6400

THIS AGRICULTURAL SECURITY AGREEMENT dated June 7, 2007, is made and executed between B & H FLOWERS, INC. ("Grantor") and Mid-State Bank & Trust, a Division of Rabobank, NA. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

> All Inventory, Accounts, Equipment, General Intangibles and Farm Products, and Crops as detailed in that certain UCC Financing Statement filed with the Secretary of State November 10, 2003 numbered 0331860374 evidencing the perfection of Lender's secured interest in the Collateral

The Collateral includes any and all of Grantor's present and future inventory (including consigned inventory), related equipment, goods, merchandise and other items of personal property, no matter where located, of every type and description, including without limitation any and all of Grantor's present and future raw materials, components, work-in-process, finished items, packing and shipping materials, containers, items held for sale, items held for lease, items for which Grantor is lessor, goods to be furnished under contract for services, materials used or consumed in Grantor's business, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on accounts, chattel paper and instruments.

The Collateral includes any and all of Grantor's present and future accounts, accounts receivable, other receivables, contract rights, instruments, documents, notes, and all other similar obligations and indebtedness that may now and in the future be owed to or held by Grantor from whatever source arising, and all monies and proceeds payable thereunder, and all of Grantor's rights and remedies to collect and enforce payment and performance thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future rights, title and interest in and with respect to the goods, services, and other property that may give rise to or that may secure any of the foregoing, including without limitation Grantor's insurance rights with regard thereto, and all present and future general intangibles of Grantor in any way related or pertaining to any of the foregoing, including without limitation Grantor's account ledgers, books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's now owned and hereafter acquired equipment, machinery, furniture, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well as to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.

The Collateral includes all general intangibles, choses in action and causes of action and all other intangible personal property and rights of Grantor of every nature and kind, now owned or hereafter acquired, including without limitation corporate or other business records, inventions, designs, blueprints, plans, specifications, patents, patent applications, trade marks, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, tax refund claims, insurance proceeds, including without limitation insurance covering the lives of key employees on which Grantor is beneficiary, and any letter of credit, guaranty, claim, security interest, or other security held or granted to Grantor to secure payment of any indebtedness.

The Collateral includes any and all of Grantor's present and future rights, title and interest in and to all crops growing or to be planted, cultivated, grown, raised and/or harvested together with any and all agricultural and farm products produced or derived therefrom, of every nature and kind whatsoever, together with all present or future inventory of Grantor and the products thereof, of every type and description, derived or to be derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's related equipment, and any and all additions thereto and substitutions and replacements therefor, and all accessories, attachments, and accessions thereto, and all proceeds derived or to be derived therefrom, whether in cash, farm products, or otherwise, and whether from or through any federal or state government agency or program or otherwise, including without limitation all easements, profits, rights of storage, trailing and grazing, and irrigation and water rights; all entitlements, rights to payment, and payments, in whatever form received, including but not limited to, payments under any governmental agricultural diversion programs, governmental agricultural assistance programs, the Farm Services Agency Wheat Feed Grain

# AGRICULTURAL SECURITY AGREEMENT

### (Continued)

Program, and any other such program of the United States Department of Agriculture, warehouse receipts, chemicals and fertilizers, documents, letters of entitlement, and deficiency, conservation reserve, and diversion and storage payments, all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale or other disposition of any of the foregoing, and any rights of Grantor to collect and enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way relating or pertaining to any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all farm products, harvested crops and all processed crops, whether or not produced by Grantor, livestock, poultry, feed, seed, fertilizer, insecticides, herbicides or other agricultural chemicals and supplies. Accounts and proceeds, all accounts receivable, contract rights, cash and non-cash proceeds from the sale, exchange, collection, or disposition of any collateral. All contract rights, chattel paper, documents, accounts, general intangibles, whether now owned or hereafter acquired by Grantor, including, but not limited to, payments in cash or in kind (under any current or future estate or federal government programs), including but not limited to, governmental agricultural diversion programs, governmental agricultural systems programs, and all proceeds of the foregoing and all general intangibles.

The Collateral includes any and all of Grantor's present and future farm products, livestock, poultry, agricultural commodities and other farm products of every type and description, including without limitation all replacements and substitutions therefor and additions thereto, and further including without limitation any and all offspring, unborn livestock, and other products, previously, contemporaneously and/or in the future acquired by Grantor whether by purchase, exchange, accretion or otherwise, and all of Grantor's present and future inventory in any way derived or to be derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's equipment in any way related thereto, and any and all additions thereto and substitutions and replacements therefor, and all accessories, attachments, and accessions thereto, whether added now or later, and all other products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to execute financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located. Grantor promptly shall procure the execution, acknowledgment, and delivery of such subordination, consent, waiver, estoppel, and other agreements as Lender shall require by holders of any encumbrances upon or by owners of such lands where Collateral is or will be located. Grantor consents to Lender's rights of access for cultivation of crops upon such terms as Lender may deem satisfactory.

# AGRICULTURAL SECURITY AGREEMENT

(Continued)

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Sale of Collateral.** The following provisions relate to any sale, consignment, lease, license, exchange, transfer, or other disposition of crops or other farm products included as all or a part of the Collateral:

(1)  To induce Lender to extend the credit or other financial accommodations secured by this Agreement, Grantor represents and warrants to Lender that Grantor will sell, consign, lease, license, exchange, or transfer the Collateral only to those persons whose names and addresses have been set forth on sales schedules delivered to Lender. Each schedule shall be in such form as Lender may require, including identification of each type of Collateral.

(2)  Grantor agrees to provide the Lender a written list or schedule of the buyers, commission merchants, and selling agents to or through an individual including the entity name, contact name and address to whom or through whom the crops or other farm products may be sold, consigned or transferred. All such schedules and notifications shall be in writing and shall be delivered to Lender not less than fourteen (14) days prior to any such sale, consignment or transfer of the crops or other farm products. Also, the Grantor agrees to provide any updates or amendments to these schedules or lists to the Lender.

(3)  All proceeds of any sale, consignment, lease, license, exchange, transfer, or other disposition shall be made immediately available to Lender in a form jointly payable to Grantor and Lender. No provisions in this Agreement shall be interpreted to authorize any sale or disposition of Collateral unless authorized by the Lender in writing. All chattel paper, contracts, warehouse receipts, documents, and other evidences of ownership or obligations relating to the Collateral, whether issued by a co-op, grain elevator, warehouse, marketing entity, or bailee, and all accounts and other proceeds of the Collateral shall be immediately endorsed, assigned and delivered by Grantor to Lender as security for the Indebtedness. At any time before or after the occurrence of an Event of Default, Lender may collect all proceeds of the Collateral without notice to Grantor. All proceeds of the Collateral, when received by Lender, may at Lender's sole discretion be applied to the Indebtedness. Grantor grants Lender a limited power of attorney to sign or endorse Grantor's name on all writings described in this section.

(4)  Grantor acknowledges that if the crops or other farm products are sold, consigned, or transferred to any person not listed on a schedule delivered to Lender as provided above, and if Lender has not received an accounting (including the proceeds) of such sale, consignment or transfer within ten (10) days of the sale, consignment or transfer, then under federal law, Grantor shall be subject to a fine which is the greater of $5,000 or 15% of the value of benefit received from the sale, consignment or transfer to an unlisted buyer, consignee or transferee.

**Care and Preservation of the Crops.** Grantor shall (1) At seasonable and proper times and in accordance with the best practices of good husbandry attend to and care for the crops and the tillage of the land and do, or cause to be done, any and all acts that may at any time be appropriate or necessary to grow, farm, cultivate, irrigate, fertilize, fumigate, prune, harvest, pick, clean, preserve, and protect the crops; (2) Not commit or suffer to be committed any damage to, destruction of, or waste of the crops; (3) Permit Lender and any of its employees and agents to enter upon the premises where the crops are located at any reasonable time and from time to time for the purpose of examining and inspecting the crops and the premises; (4) Harvest and prepare the crops for market and promptly notify Lender when any of the crops are ready for market; (5) Keep the crops separate and always capable of being identified; and (6) Promptly give Lender written notice of any disease to, any destruction of, any depreciation in the value of, or any damage to the crops.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount

# AGRICULTURAL SECURITY AGREEMENT

(Continued)

adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, hail, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. In addition, Grantor shall obtain at its expense any federal or state crop insurance required by Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under

# AGRICULTURAL SECURITY AGREEMENT

(Continued)

the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interes given to secure the Indebtedness. Grantor agrees to pursue and conduct diligently Grantor's farming, agricultural and other business operations for as long as this Agreement remains in effect. Grantor further agrees that Lender may from time to time enter upon Grantor's premises for the purpose o ascertaining whether Grantor is properly and prudently conducting Grantor's farming, agricultural and other business operations. Grantor shall promptly pay when due all costs and expenses associated with Grantor's farming operations, including without limitation Crops and Farm Products / Livestock.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paic by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable or demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due anc payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's or any Grantor's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cross-Default.** HANS BRAND OR ESTHER BRAND ("GUARANTOR") FAIL TO COMPLY WITH OR TO PERFORM ANY OTHER TERM, OBLIGATION, COVENANT OR CONDITION CONTAINED IN ANY NOTE PAYABLE TO LENDER OR IN ANY RELATED DOCUMENTS OR TO COMPLY WITH OR TO PERFORM ANY TERM, OBLIGATION, COVENANT OR CONDITION CONTAINED IN ANY OTHER AGREEMENT BETWEEN LENDER AND GUARANTOR, INCLUDING WITHOUT LIMITATION, THAT CERTAIN PROMISSORY NOTE DATED JUNE 7, 2007 EXECUTED BY GUARANTOR IN FAVOR OF LENDER IN CONNECTION WITH LOAN NUMBER 9420465888 (the "Brand Note")

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

# AGRICULTURAL SECURITY AGREEMENT

(Continued)

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Care and Possession of the Crops.** Lender may enter upon the premises where any Collateral consisting of crops is located and, using any and all of Grantor's equipment, machinery, tools, farming implements, and supplies, and improvements located on the premises: (a) Farm, cultivate, irrigate, fertilize, fumigate, prune, and perform any other act or acts appropriate or necessary to grow, care for, maintain, preserve and protect the crops (using any water located in, on or adjacent to the premises); (b) Harvest, pick, clean, and remove the crops from the premises; and (c) To the extent then permitted under California law, appraise, store, prepare for public or private sale, exhibit, market and sell the crops and any products of the crops; provided that Grantor hereby agrees that if Grantor is the owner of record of the premises upon which the crops and any products of the crops are located, Lender shall not be responsible or liable for returning the premises to their condition immediately preceding the use of the premises as provided herein or for doing such acts as may be necessary to permit future crops to be maintained on the premises.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**CROSS-COLLATERALIZATION.** In additional to the Note, this Agreement secures the following obligations: The Commercial Guaranty dated June 7, 2007 executed by Grantor in favor of Lender with respect to Loan Number 9420465888 to Hans Brand and Esther Brand in the amount of $1,000,000.00.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

# AGRICULTURAL SECURITY AGREEMENT

(Continued)

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Agricultural Security Agreement, as this Agricultural Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Agricultural Security Agreement from time to time.

**Borrower.** The word "Borrower" means B & H FLOWERS, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L., No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

# AGRICULTURAL SECURITY AGREEMENT

(Continued)

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means B & H FLOWERS, INC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents and the Brand Note, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Mid-State Bank & Trust, a Division of Rabobank, NA., its successors and assigns.

**Note.** The word "Note" means the promissory note dated October 21, 2003, in the original amount of $1,500,000.00, from Borrower to Lender, together with all renewals, extensions, modifications, refinancings, consolidations, and substitutions thereof.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGRICULTURAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 7, 2007.

GRANTOR:

B & H FLOWERS, INC.

By:
Ilane Brand, President of B & H FLOWERS, INC.

LASER PRO Lending, Ver. 5.34.00.003  Copr. Harland Financial Solutions, Inc. 1997, 2007.  All Rights Reserved.  - CA  H:\CFI\LPL\PLR40.FC  TR-25552  PR-BUSBANK(W)