Andrew K. Alper (State Bar No. 088876)
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California  90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Creditor RABOBANK, N.A.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA BARBARA DIVISION

| | |
|---|---|
| In re | CASE No. 9:11-bk-12650-RR |
| B AND H FLOWERS, INC., | Chapter 11 |
| Debtor. | **RABOBANK, N.A.'S OPPOSITION TO DEBTOR'S MOTION TO USE CASH COLLATERAL AND IN OPPOSITION TO PAYMENT OF INSIDER COMPENSATION OF HANS BRAND AND JAN BRAND** |
| | Date of Hearing on Motion to Use Cash Collateral:    July 26, 2011<br>Time:    2:00 p.m.<br>Crtrm.:    201 |
| | [Date of Hearing on Insider Compensation on    July 27, 2011<br>Time:    10:00 a.m.<br>Crtrm.:    201] |

TO THE DEBTOR, ITS ATTORNEYS OF RECORD, UNITED STATES TRUSTEE, AND ALL OTHER INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

Creditor, Rabobank, N.A. ("Bank") hereby sets forth its Memorandum of Points and Authorities objecting to the use of the Bank's cash collateral by B&H Flowers, Inc., Debtor and Debtor-in-Possession herein ("Debtor") and also objects to any insider compensation being paid to Hans Brand and Jan Brand. The facts and law are set forth hereinbelow.

864539.1 | 100525-0007                                1

I.

## INTRODUCTION

The Debtor filed an emergency motion to use cash collateral which the Court heard on June 10, 2011. The Debtor was granted authority to use cash collateral through and including July 30, 2011 in accordance with the budget set forth on Exhibit B attached hereto. The Debtor was also allowed to pay Hans Brand the sum of $8,000.00 a month. These payments were allowed to be made but not exceed the amount due to the Bank and junior lien creditor Takahoshi. In addition, The Bank was to receive a monthly interest only payments from the Debtor equal to the non-default rate on the Bank's 5 loans to the Debtor. The hearing was continued to July 26, 2011.

Since that time, the Debtor noticed applications to pay insider compensation to Hans Brand and Jan Brand. The total amount of insider compensation requested by Hans Brand is $220,000.00 a year together with a company vehicle and medical insurance. The annual compensation requested by Jan Brand is $45,000.00 together with health insurance of $4,408.00. The Debtor also applied to employ Gary Wartik of Vision Consulting Group as its business adviser. The Bank objected to payment of insider compensation to Hans Brand and Jan Brand and also objected to the employment of Mr. Wartik as a business adviser. The Debtor has not noticed any hearing with respect to the employment of Mr. Wartik and presumably the Debtor is not going to employ Mr. Wartik, but the Debtor has noticed a hearing with respect to payment of insider compensation which is on July 27, 2011 at 10:00 a.m.[1]

Subsequent to the hearing on use of cash collateral on June 10, 2011, the Debtor also filed its Schedules, Statement of Affairs, Amended Verification of Creditor Mailing List and other documents on June 17, 2011. The Debtor's Schedule B reflects that the Debtor has cash on hand in various accounts totaling $619,190.00, accounts receivable with a value of $1,300,000.00 (although the book value is $2,615,089.00 which obviously reflects that some of the accounts

---

[1] Rabobank believes that the Court can decide the matter of insider compensation at the hearing on cash collateral on July 26, 2011 and there is no further need for a hearing on July 27, 2011.

receivables are not collectible), a loan to Hans Brand of $100,000.00, a loan to Santa Barbara Farms of $48,960.00, equity in the vehicles of $30,100.00, inventory with a value of $2,500,000.00, and supplies and equipment of $155,000.00. Pursuant to the Bankruptcy Schedules, the total value of the Debtor's personal property assets, not including a lawsuit against Maveridge International which is a Cross-Complaint, is $4,604,290.00. The Bankruptcy Schedules reflect Rabobank's lien on all of the assets of the Debtor, except for titled vehicles, of $5,544,616.11. The Bankruptcy Schedules also reflect unsecured priority wage claims of $56,482.62. The Bankruptcy Schedules also reflect unsecured debt of $19,030,235.30 which includes Rabobank's unsecured claim is $6,581,054.70. Thus, the Bank is both the largest secured and unsecured creditor in this case. As discussed below and in the Declarations of Thomas Mortensen and Carl W. Raggio III submitted herewith, the Bank believes this Debtor cannot reorganize and should not be allowed to use cash collateral.

## II.

## LOANS DUE TO THE BANK

As discussed in the Declaration of Thomas Mortensen submitted herewith, the Bank made 5 loans to the Debtor.

1. Loan number 9416769801 is in the principal amount of $5,000,000.00 with all advances made to the Debtor. This loan is secured by a lien on all assets of the Debtor including accounts receivable, inventory, equipment, general intangibles and the like. In other words, it is secured by a blanket lien. The loan is also personally guaranteed by Hans Brand, Esther Brand, the Brand Partnership (Hans Brand and Jan Brand are the general partners), Elena Brand Limited Partnership, and the John Arida Brand Education Trust. A workout and restructure agreement was executed by the parties on November 25, 2009, extending the maturity date on the loan to August 31, 2010. The loan was not paid when it matured and the principal sum of $4,958,669.39 together with outstanding accrued and unpaid interest of $92,975.05 was due and payable as of June 15, 2011. Interest accrues at the rate of $688.70 per day.

2. The second loan made by the Bank to the Debtor is loan number 4269700-01 in the sum of $172,448.99. The loan is secured by the same personal property assets and has the same

guaranties as does loan number 9416769801. The loan matured on August 31, 2010, and the sum due to the Bank as of June 15, 2011, was the principal sum of $172,448.99, interest of $5,335.14 and per diem interest thereafter at $39.52.

3. The third loan made by the Bank to the Debtor is loan number 9421127101 in the sum of $250,000.00. The loan is secured by the same assets of the Debtor and has the same guaranties as does loan number 9416769801. The loan matured on August 31, 2010, and the sum due as of June 15, 2011, is the principal sum of $93,736.06, interest of $1,318.17 and a per diem interest thereafter at $9.76.

4. The fourth loan made by the Bank to the Debtor was loan number 4269913-01 in the sum of $201,960.50. The loan is secured by the same assets and has the same guaranties as does loan number 9416769801. The loan matured on August 31, 2010, and the sum due as of June 15, 2011, is the principal sum of $201,960.50, interest of $3,597.42 and a per diem interest thereafter at $26.65.

5. The fifth loan made by the Bank to the Debtor is loan number 4269719-01 in the sum of $117,801.37. The loan is secured by the same assets and has the same guaranties as does loan number 9416769801. The loan matured on August 31, 2011, and the sum due as of June 15, 2011 is the principal sum of $117,801.37, interest of $3,644.48 and a per diem interest thereafter at $27.00.

Therefore, the total sum due on the five direct loans from the Debtor to the Bank as of June 15, 2011, is $5,544,616.31, plus accrued and unpaid interest of $106,870.26 and per diem interest thereafter.

**Loan to Hans Brand and Esther Brand**

Besides the loans made by the Bank to the Debtor, the Bank made a loan to Hans Brand and Esther Brand in the original sum of $1,000,000.00. This loan is guaranteed by the Debtor. This loan is also secured by a second Deed of Trust dated June 7, 2007 on the real property located at 2000 Cravens Lane, Carpinteria, California 93013 ("Cravens Property") junior in lien priority to a first deed of trust in the sum of $3,000,000.00. This loan was modified on November 23, 2009, to extend the maturity date to August 31, 2011. The loan is all due and payable. As of June 15,

2011, the aggregate outstanding principal balance of the loan is $876,757.20 plus accrued and unpaid interest in the amount of $24,549.21. Interest accrues at the daily rate of $85.24.

### Loan to Brand Partnership

Finally, the last loan made by the Bank is to Brand Partnership in which Hans Brand and Jan Brand are general partners. As general partners, they are liable for the obligations of the partnership. Nevertheless, they also executed guaranties. This loan was made on November 20, 2008 in the sum of $5,532,621.43. Brand Partnership executed a Deed of Trust on real property located at 3615 Foothill Road, Carpinteria, California 93013. The loan has matured and is all due and payable as of August 31, 2010. The loan is personally guaranteed by the Debtor. Brand Partnership failed to pay all sums due and the principal sum of $5,532,621.43 together with interest as of June 15, 2011 of $214,026.82 and interest thereafter at the daily rate of $1,306.31 is due and payable to the Bank. Brand partnership has also collected rent from the Debtor which rent should be paid to the Bank under its subordination agreement and assignment of rents.

### Summary of Debt Due to the Bank.

Therefore, the principal sums due to the Bank on the seven loans set forth above (5 loans to the Debtor, one loan to Hans Brand and Esther Brand and one loan to Brand Partnership) in which the Debtor is either a principal or guarantor total $11,953,994.94. Accrued interest through June 15, 2011, is $452,316.55 with per diem interest thereafter at the rate of $2,183.18. Therefore, the sum due as of June 15, 2011, without any attorneys fees and costs is $12,406,311.46.

## III.

## THE DEBTOR SHOULD NOT BE ALLOWED TO USE THE BANK'S CASH COLLATERAL

Pursuant to 11 U.S.C. § 363(c)(2) the trustee may not use, sell or lease cash collateral unless an entity that has an interest in such cash collateral consents or the Court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section. The use, sale or lease of cash collateral is further limited by the concept of adequate protection. A Court may prohibit or condition the use, sale or lease as is necessary to provide adequate protection of that interest. It is the trustee (or debtor in possession) that has the burden of proof on

1 the issue of adequate protection pursuant to 11 U.S.C. § 362(b) and (e) pursuant to 11 U.S.C.
2 §363(b)(1).

3     If the Debtor suggests that it has a budget and can successfully operate its future business
4 which will generate new value providing adequate protection, this argument must be rejected. For
5 example, a Bankruptcy Court in this Circuit recently rejected the argument that "hopes and
6 projections of future profitability" constituted the indubitable equivalent of a secured lender's
7 interest in cash collateral. In re Pac. Lifestyle Homes, Inc., No. 08-45328, 2009 Bankruptcy Lexis
8 711 at *34 (Bankr. W.D. Wash. March 16, 2009). The debtor real estate developer in that case,
9 whose future sale proceeds were already subject to a secured creditor's lien, argued that adequate
10 protection was given to the increase in value of the lender's collateral that was projected to occur
11 with continued construction. Id. at 30. Rejecting this argument, the Court concluded that "this
12 speculation does not compensate Lenders for the present value of the use of their Cash Collateral".
13 Id. at 34. This Court should likewise reject any such argument in this case.

14     As can be seen from the Declarations of Thomas Mortensen and Carl W. Raggio III
15 submitted herewith, year after year, proposed plan after proposed plan, the Debtor was unable to
16 meet any of its projections and expectations. Instead, the Debtor continued to lose money which
17 has resulted in a deficit net worth of over $7,000,000.00 during the last four years. As discussed
18 in the Declarations of Thomas Mortensen and Carl W. Raggio III, the problems with this Debtor
19 are as follows:

20     1.    The management doesn't get it. The Debtor lost money for four straight years in
21 large part due to its investment in the Debtor's Watsonville location. The Debtor's management
22 should have realized during the first year of its operations at Watsonville that this was not a viable
23 business but it continued to lose business and with it any ability to pay its creditors.

24     2.    The Debtor's management was never able to realistically execute any forecast or
25 plan during the last four years.

26     3.    The Debtor purchases a large volume of plant bulbs from Holland and other areas
27 and is required to pay Eurodollars. With exchange rate fluctuations, the Debtor's business is
28 dependent upon the Eurodollars remaining at $1.50 or less. Although no one has a crystal ball, it is

1 unlikely that Eurodollars will stay below $1.50.

2     4.    The Debtor is subject to problems when the weather destroys its inventory of
3 flowers. This has happened in two of the last four years.

4     5.    The Debtor is now proposing price increases in key stem flowers such as Orientals,
5 Gerberas and AS/LA which is contrary to what the current market conditions would support. In
6 the current economy, prices should not be raised but, if anything, decreased to compete with
7 foreign companies.

8     6.    The Debtor has also suggested that it will increase its sales to existing key clients.
9 However, the Debtor lost its Vice President of Sales who had a good relationship with these key
10 clients and did not intend to replace the Vice President of Sales. Therefore, it is possible that as a
11 result of its failure to keep its Vice President of Sales who had fostered relationship with key
12 clients, the Debtor may not be able to hold on to its key clients let alone increase sales.

13     7.    The Debtor has assumed that it would be able to continue its relationship with its
14 suppliers while paying the suppliers only a fraction of its existing debt. many suppliers will not
15 want to do business with the Debtor because of its inability to pay its past debt.

16     8.    The Debtor is not currently "bankable" with its current negative net worth and its
17 management. With the Debtor's current cash flow, there is no way it will be able to pay the debt
18 due to the Bank let alone its unsecured creditors.

19     9.    The Debtor's business is somewhat seasonal and dependent upon accounts
20 receivable generated during Mother's Day and Valentine's Day. Both of these holiday periods
21 have passed and therefore the Debtor will be experiencing a down turn in accounts receivable until
22 next Valentine's Day. Moreover, to the extent there are accounts receivable outstanding from the
23 Mother's Day invoices, the time is now for the Debtor to be liquidated so that the Bank can collect
24 as much of its cash collateral as possible.

25     10.    The Bank does not want insiders to be paid since payment is coming from its cash
26 collateral. It is the very same insiders who are responsible for the Debtor being in the financial
27 position it is in today.

28     Based on all of the foregoing, the Bank requests that the Court deny use of cash collateral,

864539.1 | 100525-0007

1  deny insider compensation, and request that the Court dismiss or convert this case forthwith.

2

3  DATED: July 8, 2011                    FRANDZEL ROBINS BLOOM & CSATO, L.C.

4

5

6                                          By: _____
                                              ANDREW K. ALPER
7                                             Attorneys for Creditor RABOBANK, N.A.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

864539.1 | 100525-0007

8